# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **SEROUS GEORGE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:06-CV-370-RDP** |
| | } | |
| **C&B PIPING, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

The court has before it Defendant's Motion for Summary Judgment (Doc. # 12) filed February 8, 2007.  The motion has been fully briefed and was deemed submitted, without oral argument, on March 12, 2007.  (Docs. # 3, 5, 19).

As an initial matter, the court notes that this is a difficult case.  But it is difficult not because it presents a close question under Rule 56, but rather because it produces a result that might appear unfair outside a proper Title VII framework.  This is because the employer here may be guilty of unwise labor practices - but not race discrimination. The court has carefully considered the record evidence and although that evidence suggests unwise pay practices, the Rule 56 file  is devoid of any evidence of race discrimination. The court is well aware of its proper role here.  It sits not as a super-personnel board, but as a court of law.    For the reasons outlined below, the court finds that Defendant's motion is due to be granted.

## I.      Legal Standards for Evaluating a Summary Judgment Motion

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R .CIV. P. 56.  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City*

*of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 134 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509–12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dep't. of Comty. Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987). Plaintiff has conceded that this is not a direct evidence case. (Doc. # 15, at 1).

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Second, once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 411 U.S. at 802–05; *Burdine*, 450 U.S. at 252–54; *Desert Palace*,

2

539 U.S. at 101–02.   The court is aware that the summary judgment rule applies in job

discrimination cases just as in other cases.  *Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th

Cir. 2000) (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed

on either side of the scale).


## II.   Relevant Undisputed Facts[1]

Plaintiff Serous George, who is African-American, was employed by Defendant C&B Piping,

Inc. ("C&B") or its predecessors from 1997 until 2005.  (Hannah Depo., Ex. 6).  C&B processes and

supplies pipe for industrial uses.   C&B has a machine shop, in which operators like Plaintiff use

machines to cut pieces of pipe and then modify them, often by threading the pipe and then gluing a

flange on one or both threaded ends.  (Hannah Aff.).  C&B's shop houses approximately twenty (20)

machines which handle various widths and lengths of pipe from three (3) to sixty (60) inches in

diameter and two (2) to twenty (20) feet in length.   (Hannah Aff.; Hannah Depo. p. 30).   Some

machines accommodate only larger pipes within a certain diameter range, while other machines can

only accommodate smaller pipes.  (Robinson Depo. pp. 23–25; Plaintiff Depo. p. 85).

Plaintiff started his employment with C&B in general welding and then moved to

sandblasting.  (Plaintiff Depo. pp. 15–19).  In 1998, he began working in the machine shop for $8.00

per hour on a lathe machine that threads pipe of a diameter less than sixteen (16) inches.  (Plaintiff

Depo. pp. 15–19).  Plaintiff's lathe machine was the smallest of the machines at C&B in terms of

the size of pipe that it could accommodate.  (Plaintiff Depo. pp. 17–19; Hannah Depo. pp. 26, 35;

---

[1]If facts are in dispute, the court has noted the dispute, but will "resolve all reasonable doubts
about the facts in favor of the non-movant, and draw all justifiable inferences in his favor."
*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (internal quotations omitted).

3

Carroll Depo. p. 40; Doc. # 15, Ex. 3).  Plaintiff stayed in that job and worked on that machine until he was offered transfer to a larger machine in the summer of 2005 and then resigned his employment effective September 2005.  (Plaintiff Depo. pp. 15–19; Carroll Depo. p. 40).  At all relevant times, Plaintiff's direct supervisor was Charles Hannah, who is White.  Hannah, along with Operations Manager Max Carroll, evaluated Plaintiff for raises and other pay adjustments.  (Hannah Depo. p. 78; Carroll Depo. pp. 11–12, 41).

Although a variety of factors can contribute to the rate at which each machine operator produces modified pipe, it is undisputed that daily production rates generally are lower for operators of larger machines because it takes more time to process larger pieces, *i.e.*, pieces with a diameter over thirty (30) inches.  (Carroll Depo. p. 38).  For the same reason, smaller machine operators are capable of producing smaller diameter pipes at a faster rate.  (Plaintiff Depo. p. 85; Hannah Aff.; Hannah Depo. pp. 17, 30).  Thus, it is undisputed that the production rates of operators running larger machines cannot be fairly compared to the production rates of employees running smaller machines.  (Plaintiff Depo. pp. 42–43, 85; Hannah Aff.; Hannah Depo. pp. 17, 30).  However, the evidence is in dispute as to whether some of the smaller machines are similar enough to allow the production rates of their operators to be compared with one another, and therefore the court will view the evidence in the light most favorable to the Plaintiff and assume that smaller machine operators can be properly compared.  (*Compare* Plaintiff Depo. pp. 43–60 *and* Robinson Depo. p. 19 *with* Hannah Aff.).[2]

_____

[2]Johnny Robinson, who, like Plaintiff, operated what was considered a "smaller machine," testified as follows:   "Q: Okay.  Was there any difference in the machine that you were working on and [that which Plaintiff] was working on in terms of how many it could produce? A: No, sir.  They was same similarity [sic] I guess is what I'm trying to say."  (Robinson Depo. p. 19).  Defendant disagrees with Robinson's attempt to compare machines, opining that "[t]here is no way to compare

Two types of raises are available to C&B employees:  (1) annual raises awarded at the time of the employee's anniversary date and determined by Hannah's evaluation of an employee's performance as a percentage of the maximum raise allowed by management[3] (Hannah Depo. Ex. 7; Hannah Aff.); and (2) merit raises awarded when an employee changes to a larger or more complicated machine[4] or has performed at an unusually high level in his existing job (Hannah Aff.). When annual raises are determined, Hannah's annual productivity rating for each employee is given the same consideration (20%) as Hannah's work quality rating for each employee.  (Doc. # 15, Exs. 7, 8; Hannah Depo. pp. 78–81).

In this case, the quality of Plaintiff's work at C&B is not in dispute.  Rather, Defendant was concerned only that Plaintiff's rate of production was low.  (Hannah Aff.; Hannah Depo. pp. 10, 25). Plaintiff's overall performance rating scores were as follows:  (1) 2002 – 67.5%; (2) 2003 – None; (3) 2004 – 66.0%; (4)  2005 – 74.0%.  (Doc. # 15, Ex. 8).  Plaintiff received annual raises for every year except 2003,[5]  when Hannah told him that he would not receive a raise because of his continued poor production rate.  (Hannah Depo., Ex 6; Hannah Aff.; Plaintiff Depo. pp. 39–40).  During that same year, Hannah also refused, because of low production, to award an annual raise to White

---

production between machines in the shop other than very approximately."  (Hannah Aff.).

[3]For example, if the maximum rate is 4.0% and the employee is rated at 75.0%, he or she will receive a 3.0% raise because 75.0% of the 4.0% maximum raise is 3.0%.  (Hannah Depo. Ex. 7; Hannah Aff.).

[4]New employees with no lathe experience were generally assigned smaller machines (Carroll Depo. pp. 39–40), while experienced lathe operators were usually assigned larger diameter pipe machines (Carroll Depo. pp. 39–40).

[5]Plaintiff received pay raises in May 2001 (to a rate of $9.06); May 2002 (to a rate of $9.43); June 2004 (to a rate of $9.68); and July 2005 (to a rate of $9.97).  (Doc. # 15, Ex. 6).

employee Johnny Robinson, who, like Plaintiff, also operated a smaller machine. (Robinson Depo. p. 13).

Hannah told Plaintiff that he must raise his production in order to get raises and advancement, noting that Plaintiff's production was well below what Hannah believed he could have produced with reasonable effort. (Hannah Aff.). Plaintiff asked what production rate would "keep Mr. Hannah off him," and he was told that completion of 20 flanges per day would result in no warnings or discipline, but would still not be sufficient to earn a raise, while completion of 25 to 30 flanges per day would be sufficient to earn a raise. (Hannah Depo. p. 94; Plaintiff Depo. pp. 40–41). Plaintiff testified that he could produce about 25 pipes a day on his lathe. (Plaintiff Depo. pp. 40–41).

Nonetheless, because speed was Hannah's only concern with Plaintiff's performance, and because his work quality was high and he had fewer rejects than other operators, Plaintiff was selected to train new hires. (Hannah Depo. pp. 25, 90; Hannah Aff.; Plaintiff Depo. pp. 43–63, 69–75). Training usually lasted for a couple of weeks,[6] after which time the trainees would receive permanent assignments. During this time frame when Plaintiff trained new hires, Plaintiff's hourly rate was $9.68 while the starting rate for new hires was $10.00 per hour. (Hannah Aff; Hannah Depo., Exs. 2,6; Doc. # 15, Ex. 2). Thus, Plaintiff was paid less than the employees he trained. (Plaintiff Depo. pp. 43–63, 69–75). White employees trained by Plaintiff who received $10.00 per hour included Adam Ragsdale, Steve Aderholt, Chris Calhoun, and Steve Wise. (Plaintiff Depo. pp. 43, 45, 51, 54–64). Black employees trained by Plaintiff who received the starting rate of $10.00

---

[6]The training of new hires would slow down Plaintiff's production (Hannah Depo. p. 26), although Defendant notes that Plaintiff's production rate while training did not influence his pay.

per hour included Jonathan Frazier.  (Plaintiff Depo. pp. 69–70, 71, 74–75).  Clements, who was in

charge of Quality Control at C&B and kept up with each employee's production amounts (Hannah

Depo. p. 37; Carroll Depo. p. 18), told Plaintiff that he did not understand why Plaintiff's pay was

less than the $10.00 per hour starting rate.  (Plaintiff Depo. pp. 94–95).

Although Plaintiff claims that he repeatedly asked for pay raises and to be transferred to a

larger machine so that he could make more money (Plaintiff Depo. pp. 82, 75, 66, 79), he was not

offered such a transfer until the Summer of 2005.  (Plaintiff Depo. pp. 55, 79, 82).  At that time

Plaintiff was making $9.97 per hour, and Hannah asked if he would like to work on a newly

purchased 60-inch pipe machine at the rate of $12.00 per hour.  (Hannah Depo. p. 97, Ex. 6; Hannah

Aff.; Plaintiff Depo. p. 79; Carroll Depo. pp. 40–41).[7]  Although Plaintiff claims that larger machines

were available prior to that time (Plaintiff Depo. pp. 55, 79, 82), Defendant maintains that regardless

of availability, Plaintiff had not earned transfer to a larger machine because of his slow production.

(Hannah Depo. pp. 97–98; Carroll Depo. p. 41).  Thereafter, in September 2005, Plaintiff resigned

because he felt that he was not being treated fairly, and he left C&B to work as a welder for Altec

at the hourly rate of $10.35.  (Plaintiff Depo. pp. 23–25, 33–34).

## III.    Applicable Substantive Law and Analysis

Plaintiff makes two claims in this case, both under the authority of Section 1981:  (1) he was

discriminated against in terms of his compensation on the basis of his race; and (2) he was

constructively discharged from his employment with Defendant.  (Plaintiff Depo. pp. 25, 64–66).

The court will address each claim in turn.  As an initial matter, however, the court notes that it has

_____

[7]The record is not clear as to whether Plaintiff actually worked on the new machine before

he resigned.

relied on cases interpreting the Title VII standard for Plaintiff's claims because the standards for evaluating Section 1981 and Title VII claims are the same. *See Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (holding that Title VII and § 1981 have the same requirements of proof and use the same analytical framework).

## A.    Disparate Pay

In this Circuit, individual disparate pay claims brought under Section 1981 are governed by the familiar burden-shifting framework set out by the Supreme Court in *McDonnell Douglas.  See Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1528 (11th Cir. 1992) (adopting the *McDonnell Douglas* framework for disparate pay claims).  To establish a *prima facie* case of race discrimination in compensation, Plaintiff must prove that he "was paid less than a member of a different race was paid for work requiring substantially the same responsibility."  *Pittman v. Hattiesburg Municipal Separate School District*, 644 F.2d 1071, 1074 (5th Cir. 1981);[8] *see also Morgan v. City of Jasper*, 959 F.2d 1542 (11th Cir. 1992).  In other words, Plaintiff must show: (1) he is a member of a protected class; (2) he received lower wages; (3) similarly situated comparators outside of the protected class received higher compensation; and (4) he was qualified to receive the higher wage.  *Cooper v. Southern Co.*, 390 F.3d 695, 735 (11th Cir. 2004).  In this case, the court will assume — without deciding — that Plaintiff has made out a *prima facie* case of discriminatory pay.[9]

---

[8]*See Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (decisions of the Fifth Circuit handed down before close of business on September 30, 1981 are binding precedent on the Eleventh Circuit).

[9]The court notes, however, that many of the workers to whom Plaintiff seeks to compare himself *arguably* were not similarly situated to him and thus are not proper comparators.  According to Defendant, *none* of the workers in the machine shop are proper comparators because "[t]here is

### 1.      Defendant's Articulated Reason for the Pay Disparity

The heart of the court's analysis of Plaintiff's pay claim, therefore, is a close examination of Defendant's articulated, legitimate, non-discriminatory reasons for the pay disparity.  Defendant generally asserts that Plaintiff's poor production rate, combined with the cumulative effect of increased starting salaries and Defendant's "percentage" annual raise system, resulted in his pay being lower than the other White employees to whom he seeks to compare himself.  Defendant explains that initially, it docked Plaintiff's annual raise percentage (including a missed raise altogether in 2003) because his production rate was poor.[10]  Thereafter, because Defendant computes

no way to compare production between machines in the shop other than very approximately." (Hannah Aff.).  Despite Defendant's view that Plaintiff lacks *any* proper comparator, the court views the facts in the light most favorably to Plaintiff, who, of course, disagrees with Hannah's assessment and maintains that size of pipe and machine have nothing to do with production rates.  (Plaintiff Depo. pp. 43–60).  In any event, neither party disputes that the production rates of employees who ran larger machines cannot be compared to the production rates of employees who — like Plaintiff — ran smaller machines.  (Plaintiff Depo. pp. 42–43, 85; Hannah Aff.; Hannah Depo. pp. 17, 30). Therefore, Plaintiff's attempts to satisfy his *prima facie* burden by comparing his hourly rate and production levels with those of larger machine operators must fail.  Ultimately, though, the court has decided to forego the *prima facie* analysis of whether Plaintiff has pointed to proper comparators outside of his race whose hourly rate exceeded his.  The court is mindful of the Eleventh Circuit's pronouncement that the Title VII/Section 1981 comparison of whether jobs are "similarly situated" is more "relaxed" than that of the Equal Pay Act (which requires that jobs require equal skill, effort and responsibility and be performed under similar working conditions), *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir.1992), and will assume — without deciding — that Plaintiff has met his *prima facie* burden.

[10]The court is not persuaded by statements in Plaintiff's brief that insinuate Defendant may not have really considered his production rate to be a problem.  (*See, e.g.,* Doc. # 15, at 34–35 ("[A]simple comparison of Plaintiff's overall performance shows that Defendant did not consider him a sub-par performer;" "Defendant's alleged problem with Plaintiff's production is also contradicted by their own evaluation documents.").  It is undisputed that Plaintiff failed to receive an annual raise in 2003 and that he was told this was because of his continued poor production rate. (Hannah Depo., Ex 6; Hannah Aff.; Plaintiff Depo. pp. 39–40).  It is undisputed that Hannah told Plaintiff that he must raise his production in order to get raises and advancement, noting that Plaintiff's production was well below what he could have produced with reasonable effort. (Hannah Aff.).  It is undisputed that Plaintiff asked what production rate would "keep Mr. Hannah off him."

annual raises as a percentage of prior base pay, the *dollar* amounts of Plaintiff's raises were lower than that of employees with a higher base pay — even though the *percentage* of Plaintiff's raise may have been greater than, or equal to, that of other employees.[11]   Therefore, Plaintiff's pay rate never

---

(Hannah Depo. p. 94; Plaintiff Depo. pp. 40–41).  Although Plaintiff may disagree with Hannah's assessment of his production as "low," he cannot dispute that Defendant considered his production to be a performance concern during the relevant time period.

[11]The court rejects Plaintiff's suggestion that because the only reason *told to Plaintiff* for his lower pay was his alleged production, then Defendant's reliance on its percentage raise system is a post-litigation fabricated reason for the wage differential.  (Doc. # 15, at 8) (arguing that any "newer [or] improved" reason other than "poor productivity" only "dig[s] [Defendant] deeper into the pretext hole" and shows that "discrimination is the real reason for the discrepancy.").  Even though it is undisputed that Defendant told Plaintiff only that his poor productivity was to blame for his rate of pay (Plaintiff Depo. p. 78), that does not prevent Defendant from explaining to this court how the nature of its percentage raise system tends to result in larger raises for employees who begin at a higher rate of pay, regardless of the merit of each employee.  Plaintiff does not contend that Defendant has fabricated the very *existence* of a percentage system for calculating annual raises.  In fact, Plaintiff admits that "it is a simple matter of mathematics . . . [that] the amount of raise was determined by multiplying an employee's final [overall performance] score by the maximum rate [of raise allowed for that particular year] and against by [each employee's] base rate of pay."  (Doc. # 15, at ¶ 39).  Plaintiff does not dispute that Defendant has — all along — calculated raises based upon a percentage of an employee's prior rate of pay.  Rather, Plaintiff quibbles with the fairness of the system and the fact that those percentages were not explained to Plaintiff at the time of the decision.  That is not enough for the court to conclude that Defendant has altered or added to its litany of reasons for making the challenged decisions and, for reasons explained in more detail below, it does not indicate that part of Defendant's explanation is pretextual.

"caught up," and when Defendant increased the starting rate of pay for its new hires,[12] Plaintiff was left making less per hour than employees who had just been hired.[13]

_____

[12]Defendant maintains that due to its need to pay competitive wages to attract good employees, it has steadily increased its starting rate for new hires in the machine shop. (Hannah Depo. Ex. 2). Plaintiff claims that the evidence does not support Defendant's averment that it paid new operators a standard "starting rate," and he repeatedly berates Defendant for not having an established "pay plan" or a policy for determining starting salaries. (*See, e.g.,* Doc. # 15, at 6, 10, 11, 39). Plaintiff's arguments miss the mark. Although Plaintiff is correct that certain pay records in the summary judgment record indicate a wide-range of hourly rates paid to operators who started working for Defendant at various times (Doc. # 15, Exs. 2, 5, 6, 11, 18), that evidence does not show the lack of a consistent starting rate for new machine shop employees who were hired around the same time. The pay records upon which Plaintiff relies appear to be "snapshots" of the pay rates of certain employees at random points in time, without any indication of whether those employees started in the machine shop or instead started in another area of Defendant's operation where their pay would have been set at an unknown rate for different reasons and by different supervisors. Moreover, across the top of one of the exhibits is the statement that new hires from 2002-mid 2004 were paid a starting salary of $9.00 an hour, while new hires from mid-2004 to 2005 were paid $10.00 an hour. (Doc. # 15, Ex. 2). That evidence tends to suggest that at least as early as 2002, Defendant had established a set "starting rate" for new hires. In any event, and most importantly, *the evidence is not in dispute that since 1997, when Plaintiff was hired at $8.00 an hour, Defendant has steadily increased the starting salary of new employees.* Thus, even if the evidence does not dispositively indicate that one established starting salary was assigned to all employees who began work in the same time frame, that does not matter. The important fact — that Defendant has consistently raised its starting salary in the years since Plaintiff was hired — is not disputed. Moreover, Plaintiff does not dispute that all new hires at the end of 2004 were paid $10.00 an hour. (Plaintiff Depo. pp. 43–63, 69–75).

[13]In a garden-variety pay disparity case, a defendant may rely upon seniority as a justification for paying long-term employees at a higher rate than a recently-hired plaintiff. In this case, however, the situation is reversed. Defendant has asserted that Plaintiff's seniority is actually one of the reasons why his pay was *lower* than that of many employees who began working in the machine shop after Plaintiff was hired. Because Defendant has increased its starting pay in the years since Plaintiff was hired, and because annual raises are based upon a percentage of current base pay rate, a newer employee will quickly increase the gap between his pay and the pay of an employee like Plaintiff who has been with the company for a longer time but started at a lower rate of pay. When a long-term employee has also missed or received low annual raises in his years of employment (like Plaintiff), a lower rate of pay than new hires is virtually guaranteed. For example, employees who were hired at $10.00 per hour in 2004 — six years after Plaintiff began working in Defendant's machine shop at an hourly rate of $8.00 — made 32 cents more than Plaintiff's June 2004 hourly rate of $9.68, even though Plaintiff had consistently received annual pay increases for five years (with the exception of 2003) and even though Plaintiff was selected to train those new — but higher paid

Although the court will examine the effects of Defendant's raise system in more detail below, the court concludes that the above proffer from Defendant meets its "exceedingly light" burden to advance non race-based reasons why Plaintiff's rate of pay was lower than some White employees.[14] Therefore, the burden shifts to Plaintiff to demonstrate by a preponderance of the evidence that Defendant had a discriminatory intent in setting Plaintiff's pay. In other words, Plaintiff must show

---

— employees when they were hired. Likewise, Mark Scott, an African-American machine operator who started at a rate of $8.00 an hour in February 2001, and received significant raises in the following years, was still making $10.00 an hour in November 2004 — which was equivalent to the starting rate of all new hires during that time period. (Hannah Depo. pp. 64, 68; Doc. # 15, Ex. 2). Just like Plaintiff, Scott's seniority played a role in keeping his hourly rate lower, regardless of his merit.

In fact, after reviewing all of the relevant evidence of record — in particular Plaintiff's deposition — it is apparent to the court that the true nature of Plaintiff's dispute with Defendant about his rate of pay is not about race — but rather about Plaintiff's disapproval of the fact that Defendant paid a higher hourly rate to new employees, many of whom Plaintiff trained as new hires. Plaintiff testified that he became aware of a disparity in pay when he began training many of the new workers who were hired in 2004 at $10.00 per hour. (Plaintiff Depo. pp. 43–63, 69–75). Defendant observes in its brief, "it is apparent from reading [Plaintiff's] deposition that what really upset him and probably ultimately resulted in this lawsuit was the fact that by 2004 C&B's starting hourly rate for employees in the machine shop had gone up to $10.00, while [Plaintiff's] annual increases and missed raise for 2003 resulted in his pay during that period being $9.68 per hour . . . . He was not very happy to learn that he was training people who were making slightly more than he." (Doc. # 13, at 8).

[14]Given the exceedingly light burden to articulate a non-discriminatory reason for the decisions at issue, the court rejects Plaintiff's argument that Defendant "has not met the burden precisely because they have not in any way tied Plaintiff's alleged lack of production (which is seriously disputed) to any actual profit loss." (Doc. # 15, at 18). Plaintiff apparently claims that because work quality (which was undisputedly satisfactory) was considered by Defendant to be just as important as production rate in the evaluation of annual raises, then Defendant cannot rely upon poor production as the reason why Plaintiff was not given higher annual raises. While Plaintiff is correct that it is undisputed that work quality and productivity both were weighted at 20.0% of the total performance evaluation  (Doc. # 15, Exs. 7, 8; Hannah Depo. pp. 78–81), the court is nonetheless befuddled by the logic of Plaintiff's argument. It is a simple matter of mathematics that low productivity — which at 1/5 of the total evaluation was a significant factor in the final analysis of performance — could indeed result in a lower evaluation percentage and a corresponding lower annual raise.

that a discriminatory reason more likely than not motivated [the employer] to pay h[im] less." *Meeks*

*v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir.1994) (citations and quotation marks

omitted).

### 2.        Plaintiff's Arguments Regarding Pretext

As an initial matter in the analysis of whether Defendant's proffered reasons for the pay

disparity are pretextual, the court notes that even if Defendant's methods of calculating raises and

setting employee hourly rates are unfair and even unwise, that is not for this court to correct.[15]  Thus,

the fact that Defendant calculates raises based upon a percentage of prior pay does not — in and of

itself — show that Plaintiff was paid less because of intentional discrimination.[16]  It is the well-

_____

[15]Importantly, Plaintiff has not asserted a disparate *impact* claim in this case, but a disparate *treatment* claim.  Thus, Plaintiff has the burden of proving that his disparate pay was the result of *intentional* discrimination, not merely that "neutral [pay] practices which, while non-discriminatory on their face, visit an adverse, disproportionate impact on [him]."  *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274 (11th Cir. 2000).

[16]The court rejects Plaintiff's suggestion that, based upon *EEOC v. Reichold Chemicals, Inc.*, 988 F.2d 1564 (11th Cir. 1993), Defendant's percentage pay system merely perpetuates past discrimination and thus cannot be proffered as a non-discriminatory reason for the pay disparity. Plaintiff relies on *Reichold* for its purported "holding that [the] fact that [plaintiff] received larger and more frequent raises than [comparator] was irrelevant where [plaintiff] continued to receive a lower salary than [comparator]."  (Doc. # 15, at 10).  Plaintiff not only misstates the holding of *Reichold*, but in any event *Reichold* is not applicable here.  First, the portion of *Reichold* to which Plaintiff refers is found in the footnote reproduced below, and was not a part of the Eleventh Circuit's holding in that case which reversed  the trial court's award of attorney's fees:

> The trial court emphasizes the fact that Smith received larger and more frequent raises than Atchison after the grading system was implemented.  Such information is irrelevant because the frequent raises do not establish that the company was not discriminating against Smith.  She continued to receive a lower salary than her male counterpart.  A defendant cannot argue that it should escape liability because it is steadily decreasing a sex-based disparity.

*Reichold*, 988 F.2d at 1571 n. 5.

In any event, the circumstances at play in *Reichold* (and referenced in the passage cited

settled law of the Eleventh Circuit that this court does not sit as a "super-personnel department that re-examines an entity's business decisions." *Alpin v. Sears Roebuck & Co.*, 940 F. 2d 1497, 1501 (11th Cir. 1991). "[A] plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason as long as the reason is one that might motivate a reasonable employer." *Pennington v. City of Huntsville*, 261 F. 3d 1262, 1267 (11th Cir. 2001). Indeed, an "employer may [take an employment action] for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communications*, 738 F. 2d 1181, 1187 (11th Cir. 1984).

Moreover, even "[a] subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion." *Chapman v. AI Transport,* 229 F.3d 1012, 1034 (11th Cir. 2000). Thus, the court rejects Plaintiff's argument that the element of subjectivity in Defendant's evaluation of an employee's production rate renders that system "rife with the potential for discrimination." (Doc.

---

above) are simply not present here. In *Reichold,* the pay rates of both the female plaintiff and her male comparator were determined by a grading system that inexplicably set the male comparator's *initial* pay rate higher than that of the female comparator, even though their jobs were graded in the system as requiring the same skill and knowledge. *Reichold*, 988 F.2d at 1570–71. Thus, the Eleventh Circuit criticized the trial court for emphasizing the frequency and size of the raises awarded to the female plaintiff in the years after her *initial* pay had been set at a lower rate than her male comparator, noting that a company should not be rewarded for "steadily decreasing a [discriminatory] disparity." *Reichold*, 988 F.2d at 1571 n.5. In this case, Plaintiff has not compared himself to any employee whose *initial* pay in the machine shop was set higher than Plaintiff's *in the same time frame*. Instead, as outlined in Section III.A.2.a. *infra*, Plaintiff attempts to compare himself to employees whose pay rate was set higher than his either: (1) while working in an area other than the machine shop (*e.g.,* Johnny Robinson whose pay was set while he worked on the saw); or (2) when hired by Defendant in the machine shop many years after Plaintiff (*e.g.,* Donny Beard, Craig Ragsdale, and Chris Calhoun who were hired in 2004). Thus, the referenced language of *Reichold* simply is irrelevant to the court's analysis.

# 15, at 36).  Plaintiff points to Hannah's testimony that his production evaluations were not based on any "mathematical formula" but instead were very specific to the type of machine, size of the flange, and other factors (Hannah Depo. pp. 87–91), and avers that Defendant lacks "justification for creating the production grades that Mr. Hannah came up with" (Doc. # 15, at 26).  Specifically, Plaintiff complains that although one employee's objective production percentage was only 54.0%, Hannah assigned him a higher production grade of "7" due to the fact that his machine had "odd jaws" or "extended jaws."  (Doc. # 15, Exs. 3, 7; Hannah Depo. pp. 61, 88).  Plaintiff suggests that Hannah's subjective method of grading production is nothing more than a "'You want numbers? We'll give you a number!' type of evaluation."  (Doc. # 15, at 36).

Contrary to Plaintiff's assertion, Hannah's "odd jaws" explanation satisfies the *Chapman* burden to articulate a reasonably specific factual basis upon which he based his subjective opinion. Hannah has stated clearly that his evaluation of each employee's level of production was an examination not only of the actual number of pipes produced, but also of other factors that may affect that output rate (*i.e.*, type of machine, size of the flange, etc.).  (Hannah Depo. pp. 87–91). Plaintiff's disagreement with Defendant's use of subjective criteria in the process of evaluating production rate holds no water in light of clear Eleventh Circuit law on this point.

Thus, in its analysis of whether the reasons Defendant has proffered for the pay disparity are pretextual, this court must only ask if Plaintiff's disparate pay was the result of intentional discrimination.[17]   As outlined below, the court finds the answer to be a clear "no."  Setting aside all

---

[17]Plaintiff's repeated reliance on Judge Acker's statement in *Walton v. Cowin Equipment Co., Inc.*, 774 F. Supp. 1343, 1348 (N.D. Ala. 1991) that "[u]nthinking discriminatory treatment can meet the threshold of intentional discrimination, because an employer has some obligation under Title VII to think," is inapposite.  Judge Acker's "unthinking" comment in *Walton* was prompted by unusual circumstances: (1) the evidence was undisputed that the plaintiff was a loyal, hardworking employee;

of the rhetoric in Plaintiff's brief,[18] Plaintiff asserts two main pretext arguments: (1) his production rate was not the real reason for his pay rate because his production was the same as or better than other White employees whose pay was higher than his; and (2) Plaintiff should have been moved to a higher-paying machine earlier. The court will address each argument in turn.

> **a.    Plaintiff's Contention That His Production Was the Same as or Better than Other White Employees Whose Pay Was Higher**

Plaintiff points to Johnny Robinson, Craig Ragsdale, Donny Beard, Chris Calhoun, and Steve Aderholt as White employees who were also low producers, but who were paid more than Plaintiff. The undisputed evidence shows, however, that even assuming that Plaintiff had a higher production rate than any of the above-referenced employees, reasons other than race motivated Defendant to pay those employees more than Plaintiff.

First, Plaintiff compares his pay to that of Johnny Robinson, who is White and who, like Plaintiff, operated one of the smaller machines in the shop.[19]  Plaintiff complains that Robinson was

---

(2) the evidence showed that Plaintiff's race was "a sometime topic of conversation in the office;" (3) defendant admitted that race could, from time to time, be a motivating factor in its decision-making; (4) the plaintiff offered substantial evidence that she was paid less than a white employee with whom she could be fairly compared; and (5) the defendant *did not attempt to articulate a legitimate non-discriminatory reason for this disparate treatment*. *Walton,* 774 F. Supp. at 1347–48.  Thus, unlike in this case, where Defendant *has* articulated non-discriminatory reasons for the pay disparity, the *Walton* defendant's failure to articulate a non-discriminatory reason for its pay decision effectively constituted *an admission* that it failed to think when setting the pay of plaintiff and her alleged comparator.

[18]Plaintiff's brief adopts an "all but the kitchen sink" approach in his effort to demonstrate pretext. Moreover, the general sub-headings that purport to organize his pretext arguments do not accurately describe the analysis thereunder.  Thus, the court has endeavored to organize Plaintiff's pretext arguments in a more coherent fashion, addressing his two principal arguments in the body of this opinion and relegating the "peripheral" arguments to footnotes sprinkled throughout.

[19]As noted earlier on page 4 and in footnote 9 *supra*, although Defendant disputes whether some of the smaller machines are similar enough to allow the production rate of their operators to

paid approximately $1.00 more per hour despite the fact that: (1) both he and Robinson were counseled for poor performance; and (2) Plaintiff trained  Robinson on his small machine in 2002. (Robinson Deposition, p. 12).  Plaintiff argues that his performance was equal to, or better than, Robinson's based upon the fact that he trained Robinson and given Robinson's own testimony that, from his perspective, he was producing a lot less than Plaintiff when they were both operators. (Robinson Depo. pp. 16–17).  According to Plaintiff, "[i]f Defendant wishes to rely on productivity as a measuring gauge, then clearly they should have paid Plaintiff the same rate as Mr. Robinson as they were both allegedly unproductive."  (Doc.  # 15, at 9).

Plaintiff's attempt to compare his production rate to that of Robinson's as "evidence" that race played a factor in their respective hourly rates is nothing more than a red herring.  In reality, the reason why Robinson made $1.00 more an hour than Plaintiff during the timeframe in which they were both considered low producing operators in the machine shop is because Robinson made more than Plaintiff even *before* he became a machine operator in August or September 2002 and *before* both men were counseled in 2003 for low production.  (Robinson Depo. p. 17).  The undisputed evidence shows that in May 2002 — one year before Robinson exhibited production problems — Robinson worked on the outside saw at a rate of $10.44 an hour,[20] while Plaintiff worked as an operator inside the machine shop at a rate of $9.43 an hour.  (Doc. # 15, Exs. 5, 6, 8; Robinson Depo. p. 17).  Because, at that time, they performed  completely different jobs in different parts of

---

be compared with one another (*compare* Plaintiff Depo. pp. 43–60 *with* Hannah Aff.), the court will assume in its analysis here that employees like Johnny Robinson, who, along with Plaintiff, operated what was considered a "smaller machine,"are proper comparators.

[20]Hannah explains that the saw operator had to cut "every piece that goes through the shop." (Hannah Depo. p. 91).

Defendant's operation, their pay rates cannot be compared. When Robinson transferred in to the machine shop in August or September 2002, he retained his hourly rate of $10.44 an hour.  (Doc. # 15, Ex. 5).[21]

Thus, in spite of the fact that both men were targeted in 2003 as low producers in the machine shop, Defendant's method of calculating annual raises as a percentage of current salary virtually ensured that Robinson would continue to make more than Plaintiff year after year — regardless of how they performed.  It is undisputed that both men were denied an annual raise in 2003.  In June 2004, Plaintiff actually received a higher performance rating — and thus a higher annual raise *percentage* — than Robinson (66.0% compared to Robinson's 57.5%[22]).  Nonetheless, Plaintiff's hourly rate post-2004 raise still remained lower than Robinson's ($9.68 an hour for Plaintiff compared to Robinson's hourly rate of $10.68) due to fact that the actual *dollar* amounts of their raises were virtually identical given the calculation of raises as a percentage of prior pay. (Plaintiff's 66.0% rating translated into an actual raise of 25 cents compared to Robinson's 24 cents for his 57.5% rating).[23]   Even given the fact that Plaintiff trained Robinson when he transferred to the

_____

[21]Because Robinson's starting rate in the machine shop was merely carried over from his prior position, Plaintiff's assertion that "Defendant brought in Mr. Robinson making $1/hour more than [Plaintiff] was . . . . before Defendant could have any idea about how well or poor Robinson would be producing or otherwise performing," is off the mark.  (Doc. # 15, at 14).

[22]Plaintiff notes that "[w]hile we do not have Mr. Robinson's score sheet from Defendant for 2004, it is a matter of simple mathematical calculation to determine . . . [his] overall rating."  (Doc. # 15, at 13).

[23]For this same reason, Plaintiff's attempt to compare his 2005 percentage scores and actual dollar raise amounts to those of Steve Wise — a new hire in 2004 who started at $10.00 an hour — is also off the mark.  Plaintiff notes in his summary judgment opposition:  "For example, in the June 2005 ratings, [Plaintiff] received an overall score of 74.5 [%]. . . [while] his co-worker Mr. Wise, received an overall score of 66[%] or 7.5 points lower . . . . Yet Mr. Wise is still paid more than Mr. George before and after this scoring."  (Doc. # 15, at 13) (internal citations omitted).  While

machine shop, and even assuming that Plaintiff out-produced Robinson when they were both operators, the undisputed evidence makes clear that the disparity between their hourly rates had nothing to do with race.

Plaintiff next claims that race discrimination is the reason why he was paid less than White, low-producing employees Ragsdale, Beard, and Calhoun.  The undisputed evidence demonstrates otherwise.  Even if the court assumes — by viewing the testimony in the light most favorable to the Plaintiff — that Ragsdale, Beard, and Calhoun were low producers whose output was lower than Plaintiff's,[24] comparing their hourly pay rates to Plaintiff's hourly rate is like comparing apples and oranges.  Reasons other than race discrimination explain why, in spite of their relevant production levels, Ragsdale, Beard, and Calhoun were paid more than Plaintiff.

Ragsdale, Beard, and Calhoun were all hired within two months of each other in 2004 at a starting rate of $10.00 per hour (Doc. # 15, at 2), and thus were making more than Plaintiff's $9.68

---

Plaintiff's observations are technically correct, his brief fails to point out that Wise was one of many employees — both Black and White — who were hired in the machine shop in 2004 at a standard starting rate of $10.00 an hour.  (Plaintiff Depo. pp. 43, 45, 51, 54–64, 69–71, 74–75).  When those employees were hired, Plaintiff was making only $9.68 an hour.  (Doc. # 15, Ex. 6).  Thus, just as with Robinson, Wise was already making more than Plaintiff when annual raises were determined the following year and was virtually guaranteed to continue making more than Plaintiff regardless of their respective performance ratings.  Thus, the percentage raise system — and not race — was again to blame for the fact that Plaintiff was paid less than Wise after the June 2005 ratings, even though Plaintiff's overall percentage rating was higher than Wise's.

[24]Ragsdale admitted that he was counseled for low production.  (Ragsdale Depo. pp. 15–17). Hannah criticized Beard's production rate during his deposition.  (Hannah Depo. pp. 16, 73). Documents submitted to the court as part of the summary judgment record indicate that Calhoun's production rate averaged less than 54.0%.  (Doc. # 15, Ex. 3).  Because the court has assumed that Plaintiff out-produced Ragsdale, Beard, and Calhoun, it is not material that "Mr. Clements, [who was] in charge of quality control and creating the very productivity sheets on which Mr. Hannah based his judgment of employees' productivity, confided to Plaintiff that his productivity was equal or greater than other white co-workers."  (Doc. # 15, at 33 (citing George Depo. pp. 94–95)).

per hour rate when they were hired and *before* they were categorized as (or even had the chance to become) low producers.  As outlined in footnotes 12 and 13 *supra*, there is no indication that the $10.00 an hour starting rate was a pretext for race discrimination — it is undisputed that Defendant paid all new hires — both African-American and White — the *same starting rate* of $10.00 an hour.[25]  Thus, no comparison can be made between the poor production rates of individuals who were hired at the standard starting rate of $10.00 per hour and the production rate of Plaintiff, who already made less than $10.00 per hour when those individuals were hired.

It is for this same reason that the court also rejects Plaintiff's argument that "a reasonable juror could question why [Plaintiff] was paid less than individuals he was training."  (Doc. # 15, at 38).  As discussed in Section III.A.1. *supra*, it was not race, but rather the cumulative effect of elevated starting salaries and Defendant's "percentage" annual raise system (which resulted in lower annual raises for Plaintiff due to his production rate scores) that caused Plaintiff's 2004 pay rate to be less than the rate of all of Defendant's newly hired employees — Black or White.

Finally, Plaintiff compares himself to Steve Aderholt, who was also undisputedly a lower producer than Plaintiff.  (Hannah Depo. pp. 29–30, 33, 34 (discussing Aderholt's production levels)).  Again, however, the hourly rates of Aderholt and Plaintiff are not appropriately compared as Aderholt was hired by Defendant in 2003 at a starting rate of $10.00 an hour — almost five years after Plaintiff began working on his lathe machine in the shop.  (Doc. # 15, Ex. 3; Carroll Depo. p. 13, Ex. 9).  Moreover, Defendant explains that Aderholt was not "a good comparator even though

---

[25]Adam Ragsdale, Steve Aderholt, Chris Calhoun, and Steve Wise, all of whom are White, were paid $10.00 an hour along with Jonathan Frazier, who is African-American.  (Plaintiff Depo. pp. 43, 45, 51, 54–64; 69–71, 74–75).  Other Black employees who were paid a $10.00 per hour starting rate during this time frame include James Jones, Lamarvin Durrah, Glen Braggs and Jerry Keller. (Hannah Aff.).

[his machine] was a small diameter [like Plaintiff's] because of the complexity of the machine, and the fact that he didn't spend all day on that machine." (Carroll Depo. p. 13). Aderholt worked on a "turret lathe, and every piece that you put onto that machine, you have to handle it with a crane, feed it into a turret, or a tunnel on the machine, support it on the end. And then as well Steve [Aderholt] was also working the CNC machine, which required that he only work part of a shift on the lathe and then he would report to the CNC machine the rest of the shift." (Carroll Depo. p. 13).[26] The undisputed evidence in this case demonstrates that it was not race, but a later hire date with a higher starting salary and more complex job duties, that explain why Aderholt's pay rate was higher than Plaintiff's in spite of their respective production levels.

Here, Plaintiff has sought to compare himself to other employees who, while admittedly low producers, nonetheless were paid more - not because of race but rather for other legitimate, non-discriminatory reasons. Accordingly, the court rejects Plaintiff's contention that his low production was merely a pretext for paying him less because of his race.

**b.    Plaintiff's Contention that He Should Have Been Moved to a Larger Machine Sooner**

Plaintiff also questions why he was kept on such a small, low-paying machine for so long, given the undisputed evidence that a pay raise typically accompanies a move to a larger machine and considering that Plaintiff often trained individuals who then were moved to machines that

---

[26]As noted earlier, the parties dispute whether the production rates of operators who run similar-sized machines can be compared for the purposes of pay rate. (*See* Plaintiff Depo. pp. 43–60). Nonetheless, the differences in Aderholt's job duties that — at least in part — explain his rate of pay are not a result of the size of his machine or the pipe it accommodates, but rather due to the complexity and multiplicity of his tasks. In any event, Plaintiff has not challenged Defendant's explanation of the unique qualities of Aderholt's machine that differentiate it from other smaller-sized machines.

accommodated larger pipes.  (Doc. # 15, at 37 (citing George Depo. pp. 47–67)).  It is undisputed that in July 2005, Plaintiff finally was promoted to a larger machine at the rate of $12.00 per hour. According to Hannah, Plaintiff's low production rates were to blame for his delayed move to a larger machine because "you earn your way" to a larger machine and although Plaintiff "did good work, [] he was slow."  (Hannah Depo. p. 98).  Although Plaintiff opines that his lack of speed should not have held him back given Hannah's testimony that "speed doesn't come into play on a large machine"  (Hannah Depo. p. 99), that argument ignores Hannah's clear testimony that promotion to a larger machine — which typically meant higher pay — was a privilege to be *earned*.  Regardless of whether Plaintiff possessed the skills necessary to operate a larger machine, Plaintiff does not dispute that Defendant assigned equal weight to his work quality and his productivity rate when assessing performance for a promotion.  Accordingly, Plaintiff has not shown that his delayed promotion to a larger machine was anything but the result of his failure to earn that right given his continued slow production.

The court also is not persuaded by Plaintiff's contention that, when he was eventually promoted in July 2005, he should have been paid more than $12.00 per hour (a $2.03 increase in pay from his prior rate of $9.97 per hour) because White employee Billy Fortner, who also worked on a large machine at the time Plaintiff was promoted, was paid $14.49 per hour.  (Doc. # 15, Exs. 8, 11; Fortner Depo. pp. 5–11; Carroll Depo. p. 40).  Although Fortner and Plaintiff started work with Defendant within six months of each other in 1996–1997, Fortner remained a small machine operator only "a short period of time," was quickly promoted up the ladder of machine size, and was never a small machine operator at the same time as Plaintiff.  (Fortner Depo. pp. 8–11).  Beginning in 1997 or 1998 — seven years before Plaintiff was promoted to a large machine — Fortner began working

up in the ranks of machine size, receiving a raise each time.  (Fortner Depo. pp. 8–11).  Thus, it would not make sense for Plaintiff, who had only recently been moved from his small machine, to be paid the same amount in July 2005 as another employee who had been working on a large machine since 1999.[27]  (Fortner Depo. pp. 10–11).

Plaintiff ultimately bears the burden of showing by a preponderance of the evidence that he was paid at a disparate rate out of intent to discriminate on the basis of race.  *See Burdine*, 450 U.S. at 253, 101 S.Ct. at 1089 ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.").  The question becomes whether "the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'"  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996)).  In this case, Plaintiff has not met his burden for the reasons outlined above.  Accordingly, summary judgment for Defendant is appropriate as to Plaintiff's disparate pay claim.

### B.    Constructive Discharge

---

[27]Nor is this conclusion inconsistent with the court's determination that there is no Title VII violation because of Defendant's previous decisions to hire employees at a higher rate than Plaintiff was paid.  First, as the undisputed evidence shows, both black and white employees were started at rates higher than Plaintiff.  That does not suggest race discrimination.  Second, although the pay rate offered to Plaintiff ($12.00 per hour) was lower than the rate then paid to Fortner ($14.49 per hour), there is simply no evidence whatsoever that the pay difference was due to his race.

Plaintiff also asserts, almost as an afterthought, that his decision to resign in the Summer of 2005 was the result of constructive discharge.[28]   "[C]onstructive discharge occurs for the purpose of employment discrimination when the employer, rather than directly discharging the employee, creates an intolerable work atmosphere that forces the employee to quit involuntarily." *Johnson v. Woodruff*, 28 F. Supp. 2d 1248, 1250 (M.D. Fla. 1998).   A plaintiff "must show the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." *Virgo v. Riviera Beach Assoc., Ltd.*, 30 F.3d 1350, 1363 (11th Cir. 1994); *see also Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996); *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997).   "[F]or a constructive discharge claim to present a jury issue and thereby survive summary judgment, the plaintiff must produce substantial evidence that conditions were intolerable."   *Akins v. Fulton County*, 420 F.3d 1293, 1302 (11th Cir. 2005).  A *prima facie* case of constructive discharge is established if one may reasonably infer discrimination from the un-rebutted facts.  *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1559 (11th Cir. 1988).

In this case, Plaintiff has failed to establish even a *prima facie* case of constructive discharge because, as a matter of law, he has not produced substantial evidence that his work conditions were

---

[28]The extent of Plaintiff's argument is the following paragraph:

Plaintiff testified that he left C&B because of the unfair discrimination and he felt that things were never going to change.  (George Depo. p. 23.)  He had just been given a raise to $12/hour to go to a 60-inch machine, while white co-workers on smaller machines who had substantially the same seniority were making over $14/hour.   Such an absurdity justifies classifying Plaintiff's departure as a constructive discharge as it is "so intolerable that a reasonable person would have felt compelled to resign." *Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1301 (11th 2005).  No African American employee should have to tolerate such racism.

(Doc. # 15, at 19).

so intolerable when he resigned that a reasonable person would have felt compelled to leave. Plaintiff resigned shortly *after* he was given a 20.0% pay raise of $2.03 per hour.  Although Plaintiff may have been irritated that his post-raise hourly rate was still lower than the rate of other employees who had steadily increased their salaries over the years, the fact remains that the work condition that allegedly prompted Plaintiff to resign did not create intolerable work conditions.   Indeed, the Eleventh Circuit has found that "unequal pay cannot, standing alone, constitute a constructive discharge."  *Fitz*,  348 F.3d at 978 (11th Cir. 2003) (finding that the plaintiff failed to assert a constructive discharge claim because the following incidents did not create work conditions that were so intolerable that the plaintiff was forced to quit involuntarily: (1) a withdrawn reprimand; (2) statements of supervisors that plaintiff would be fired due to his race that were not supposed to be revealed to the plaintiff; (3) offensive cartoons that were not condoned by his supervisor; (4) a job offer to transfer to another managerial role after plaintiff complained of discrimination; and (5) *a claim of unequal pay*).   Accordingly, no "reasonable juror [could] conclude that the working conditions endured by Plaintiff were so intolerable as to compel a reasonable person to resign." *Fitz, Inc.*, 348 F.3d at 977.  Defendant is due summary judgment on this claim as well.

## IV.    Conclusion

For the reasons stated above, the court finds that Defendant's motion for summary judgment is due to be granted.  A separate order will be entered.

**DONE** and **ORDERED** this _____20th_____ day of August, 2007.

_____

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE